Orally argued this morning. I'll call the first case, Equal Employment Opportunity Commission v. Cash Depot Limited. We'll hear first from Mr. Sansone and then Ms. O'Connor. Good morning, Your Honors, and may it please the Court. Nick Sansone on behalf of the Equal Jury could find Cash Depot violated the Americans with Disabilities Act when it fired Barney Galloway the day he was scheduled to return from medical leave following a disabling stroke. This was error. Even on Cash Depot's own view of the facts, Mr. Galloway's disability was a but-for cause of his termination. And contrary to the District Court's opinion, there is ample record evidence from which a jury could conclude that Mr. Galloway could perform his job's essential functions despite his physical limitations. The only restriction Mr. Galloway's doctor placed on his ability to work was a 25-pound limit on lifting, pushing, and pulling. This limit was compatible with Mr. Galloway's job description, with his testimony about the tasks he performed day in and day out during seven months on the job, and even with Cash Depot's own witnesses' account of what the job entailed in practice. Moreover, a jury could easily find that Cash Depot never so much as considered multiple reasonable accommodations it could have made for Mr. Galloway's restriction. We therefore ask this court to reverse the District Court's grant of summary judgment, and we also ask this court to reverse the District Court's unexplained refusal to let the EEOC take oral testimony from the people responsible for the decision to fire Mr. Galloway. Finally, because the course of proceedings below could create the impression that the District Court has prejudged the case's merits, we ask this court to reassign the case on remand. I'll begin with the summary judgment issue, starting with the discriminatory termination claim. Cash Depot has not disputed in this appeal that Mr. Galloway was disabled within the meaning of the ADA at the time it fired him, and even in its own version of events, Cash Depot acknowledges that it fired Mr. Galloway because of his disabling physical condition. The critical question then is whether a jury could find that Mr. Galloway was a qualified person with a disability, or in other words, whether he could perform his essential job functions with or without reasonable accommodation. Contrary to the District Court's opinion, ample record evidence supports a finding that he could. Firstly, the evidence supports a finding that Mr. Galloway's 25-pound limit. Cash Depot's own written description of Galloway's job explain that its essential functions required lifting, quote, up to only 20 pounds within Galloway's capabilities, and Mr. Galloway's testimony confirms that in his seven months on the job, he never once needed to lift more than 25 pounds to perform the repairs and coin empties that everyone agrees made up the bulk of his work. Moreover, Cash Depot's own witness, John Murphy, could identify only a single type of repair as potentially requiring the ability to lift more than 25 pounds, namely repairs to an ATM's cash dispenser. But there's no evidence that Mr. Galloway or any other field service technician ever actually had to perform such a repair, and indeed Mr. Galloway's testimony confirms that in As for coin empties, the only aspect of that task that potentially involved lifting more than 25 pounds, according again to Cash Depot's own witness, Mr. John Murphy, was hauling full bags into a van for purposes of deposit in a secure facility. But this takes us to reasonable accommodation. Mr. Galloway testified that in the past, he had divided coin loads into multiple bags to facilitate this function, and Cash Depot has identified no reason to think that that would be an unreasonable step to take to accommodate Mr. Galloway's restriction. When he divided it into those bags previously, was he doing that because of his restrictions, limitations, or was he doing it for convenience? He was doing it for convenience as far as the record reveals, Your Honor. He never had the opportunity to return to work following the stroke that led to his restriction. And in addition to dividing the coin loads, another reasonable accommodation that the EEOC has put forward is to restructure Mr. Galloway's job to avoid the infrequent installation and removal work. The evidence suggests, Mr. Galloway testified, that in seven months on the job, he only had to do the installation of an air machine on one occasion. Both Mr. Galloway and Cash Depot's witnesses testified that these tasks were planned ahead of time, and that there were specialized employees known as project technicians who were chiefly responsible for providing this work. Mr. Murphy, again Cash Depot's own witness, testified that these tasks, he saw no reason why they couldn't be reassigned to other workers, and indeed Mr. Murphy testified that Cash Depot had successfully engaged in job restructuring to accommodate lifting restrictions in the past. And finally, even if no reasonable juror could conclude that Mr. Galloway was capable of performing his work, his essential job functions, with or without reasonable accommodation at the time Cash Depot terminated him, Cash Depot has period of unpaid leave for a brief period of a few weeks so that he could consult a neurologist to determine whether the lifting restriction could be lifted. As indeed we found out just a few weeks after he was terminated, that restriction was indeed lifted. And on top of all that, a reasonable jury would have to consider evidence of pretext. In other words, there is evidence that Mr. Galloway's 25-pound pushing, pulling, and lifting restriction is not the real reason that Cash Depot terminated him. Indeed, it hired his replacement before it even learned of this restriction. And when it did learn of the restriction, it fired Mr. Galloway within 30 minutes of receiving a doctor's note setting out his restrictions without engaging in any dialogue to assess the possibility of reasonable accommodations. Again, Cash Depot itself has the reason it has offered for terminating Mr. Galloway is itself his disability. It's the 25-pound pushing, pulling, lifting restriction. So it's liable under the ADA either way, but evidence of pretext could inform a reasonable jury's calculus as to whether or not this lifting restriction really was disabling in terms of his ability to perform the essential work functions. So unless your honors have any questions on the summary judgment point, I'll turn briefly to the discovery issues and to our request for reassignment. So as for discovery, the district court offered no explanation for refusing to authorize the EEOC to depose the only two living individuals who were involved in the termination decision at the heart of this case. Federal Rule of Civil Procedure 30A1 creates a background rule that allows the district court to depose individuals without court authorization. The district court in this case entered an order essentially subverting that rule and requiring preauthorization and it offered no explanation for refusing to allow the depositions in this case. The only thing . . . Is that some kind of a standing order in that particular court or district that you have to I'm not certain if the court enters that order in every case. Certainly in the Miller case that we cite in our briefs and in which this court ordered reassignment, the district court, the same district court, did enter that sort of an order and that was one of the grounds on which this court relied in determining that the discovery restrictions in that case were unreasonable. The only explanation that the district court ever gave for refusing to authorize these depositions was specifically related to HR Director Darlene Lassiter and its explanation for refusing that deposition was the district court's pre-judgment that Ms. Lassiter, in the district court's words, may have delivered the termination message, but she wasn't involved in the decision-making process. However, Cache Depot's own witnesses, both Mr. Miller and Mr. Murphy, testified without dispute that indeed Ms. Lassiter was involved in the decision-making. And that takes us to our reassignment point. The district court's factual pre-judgment on that issue, despite evidence to the contrary, is indicative of a pattern that pervaded the proceedings below. I think the clearest example of this sort of pre-judgment occurred at the very initial pre-trial conference in January 2020, before any evidence was taken, when the only things before the district court were the pleadings. And the district court said, this case has very clear facts. Cache Depot require—the job description requires an ability to lift 50 pounds. Mr. Galloway couldn't do that. Cache Depot didn't, quote, didn't do it. There was no malice, no trickery. EEOC counsel stepped in to correct a factual misrepresentation. The district court had said that the job description required a 50 pound—ability to lift 50 pounds. EEOC counsel corrected the record and said, no, in fact, the job description listed only a requirement of 20 pounds, which was within Mr. Galloway's capabilities. District court's response to that, so what? Again, this was at the very initial pre-trial conference. Those sorts of pre-judgments and pre-resolution of the case's merits pervaded the proceedings below. We discuss in-depth particular instances in the district court record. So unless this court has any questions on that or on the remainder of the issues in the case, I'll reserve the remainder of my time for rebuttal. Thank you, sir. Thank you. Good morning, Your Honors. Judge Dennis, can you hear me okay? I'm not speaking loud enough. Good morning. I'm Kathleen O'Connor. I'm counsel for Cash Depot. I was the trial attorney down below, so I do have a little bit more knowledge of some of the things that went on. But to start off in addressing some of the points raised by my opposing counsel, Mr. Sansoni, I'll start with the evidence of what the actual duties were of Mr. Galloway as a field technician. The EEOC concentrates on one job, the coin redistribution, because they know that that job did require pushing, pulling, or lifting more than 25 pounds. So that was one of the essential functions of Mr. Galloway's job, but there are other essential functions of his job, and they're set forth in the job description, which the EEOC relies on, which is at record evidence, I believe, 45. But Mr. Galloway is hired to install, convert, repair, remove, and work on ATM machines and AIRVAC machines. They are at convenience stores. They are outside of convenience stores or car washes, things of that nature. So it's out in the public. As the evidence in the record shows, at 344 and 345, even making repairs on an AIRVAC machine or an ATM machine requires him to exceed those restrictions. The compressors, the parts of the ATM machine that you have to get to to make a repair of the cash dispenser requires the removal of equipment that exceeds it, and it's set forth in the record, exceeds 25 pounds. Just the compressor at an AIR machine weighs 26 pounds. The compressor unit of a Thomas 3 compressor weighs 38 pounds. So even to get access to those parts, he has to remove them, push, pull, manipulate them. There are other—the ATMs clearly weigh more. They— He says he only had to do that once in seven months. The record shows he had one installation and removal. That is correct. But he had repairs on those machines. He also had to move those machines. You would go to a stop-and-go, for instance, is what we have in Houston convenience store, where he would go in on any given day, and the store manager would make him move an ATM machine from one spot to another. Those are in the record of what his actual job tasks were by the dispatch, and that is part of the record that shows exactly what he was required to do. That is at 154 in the record. The descriptions of what he had to do during that time period may not be exactly what shows up, but he had to move, make repair, address compressors on the AIR machines. The coin retrieval that is so heavily focused on in this case by the EEOC, that was not a job that took him all day. That was just part and parcel of all the other tasks and assignments he would be assigned per day. He made what they call coin drops three or four times a week at various locations, but that was one essential job function. The actual job that he applied for identifies what the essential job functions are on Record Excerpt 45. It talks about repair, install, maintain van inventory, which our evidence in the record talks about. Even doing that, where he would have spare parts, compressors in the van, he has to move, account for, maintain. A dolly, there's evidence in the record that his tools, a dolly weighs 75 to 85 pounds. Using those to move even one time would violate the restriction. The law requires the court to take all of that into account, not just one task. I think what the EEOC tries to argue before the court is all of these other tasks that Mr. Galloway was required to perform were marginal, and that they focus on that the coin drop is the only essential task, and that is not what the evidence bears. And so under the case law, the court has to take into consideration the actual evidence of what he is to do, and that is what we set forth in our pleadings. They're not marginal tasks to the extent that Mr. Galloway is trying to create a factual issue by saying, well, the coins are most of the work. That's not enough. It's what the actual tasks are, and that's in the case cited by the district court. Further, the EEOC only referenced Mr. Miller. Mr. Miller was the ex-supervisor of Mr. Galloway, and hadn't acted as a field technician in years. There is evidence from Mr. Mueller and Mr. Kozicki of what was actually required of Mr. Galloway. And so the employer's judgment under the EEOC versus LHC, the employer's judgment is what's to be considered over and above the written description. And now if we talk about the job description, it does say up to 20 pounds, but it also says bending and heavy lifting. When Mr. Galloway describes the job that he had done for those seven months, he's talking about what he was actually required to do. So you're saying, in deciding whether or not to grant summary judgment for Cash Depot, the court just accepts the employer's description of the job without regard for the employee's description of what he actually did for those seven months. The court should accept the employer's description of the job and decide that summary judgment is appropriately granted. There's no fact issue because the employer's description of the job is the fact. Your Honor, I would say that the court can consider what an employee says, but what the cases say is that that's not enough to create a fact issue if you look at what was actually done. And I'm not just referring to the job— But isn't Mr. Galloway describing what was actually done? But when you look at the records in the summary, if you look at the evidence in some summary judgment record that I referred to where it says every dispatch call he had for all of those months, they're not just cash drops. They are customer service. They are working on repairs. They are working on airbags. So in his deposition, he wanted to limit it to that. But the actual evidence in the record— What do you say about the testimony of Murphy's manager, Brad Mueller? He made the decision to—had made the decision to grant and deny accommodations, but he didn't make it here. But you did get the discovery from him, his successor, who testified that the employee would have the assistance of tools or another worker doing heavier jobs than himself. So the difficulty I'm having as you list your presentation is that we have an issue here over refusal to grant discovery to someone who appears now to be a very critical witness. So, because he's talking about the actual practice, if you will, when these other larger jobs are required, that there are more people added to that job routinely, and that you're just trying to do that here, which would be a refusal to accommodate. Are you talking about Brad Mueller? Yes, ma'am. Brad Mueller was deposed. And I'm talking—what about—I understand that. Oh, okay. But I'm talking about exactly what he testified to. Brad Mueller testified to certain projects. For instance, Cash Depot lost this— What about his successor? Kola—I don't know how to pronounce it. I'm sorry. What about his successor? I don't know how to pronounce it. Joshua Kola. Kola. Joshua is what I called him. Well, as I understand it, he confirmed that an employee would have the assistance of tools or another worker to inherit jobs himself. Is that accurate or— Well, that is on the 900-pound installation of ATM machines. That was what he was specifically referring to in that testimony. And there's no doubt about that. But the actual smaller ATM machines and the moving the ATM machines and the working on and replacing their cash dispensers and replacing the compressors and the airbags, that was a—these are single individual jobs. They don't work in teams. They have 150-mile territories that they each cover. And not one time during the seven months that Mr. Galloway worked there did he ever work with another person on any job. Does that mean that he didn't—during seven months, he didn't aid one? Well, for the work he was doing, because he didn't have any restrictions, he did not need one. I guess I'm not following you. Was he able to do the job? Without any accommodations? Yeah. There was not any report that he was not able to do his work. Did he do the job? As far as the evidence is, he did the job that he was asked to do during the seven months he worked there. Okay. But during the time that he did that, he would be—what does the record show as to what he was actually doing? I thought there was some testimony about what he did as an employee actually did. That was what Mr. Joshua testified to in his update. He listed out every aspect of what a field technician did, what it entailed, how it worked, what tools they would use to do that job. He identified that and explained everywhere that those tasks that a field technician would do would exceed the 25-pound restriction. That's in the record by the evidence of Mr. Joshua Kolodziejski. The task record on Appeals 74 through 78 and Mr. Kolodziejski's testimony is at record on Appeal 344 and 345. What I'm suggesting—what I'm asking about is there was a period of time before he had his aneurysm and before he presumably had any disability that he knew about that he was doing this job. And I don't hear any evidence that he was not doing the job and it was a sustained period of time. I don't know how long was that. How long had he been there doing this job? About seven months. Only seven months. And during that seven months, he was not called upon to move these big machines or exceed his pound requirement. I mean, the actual fact—I know there's no limitation, but in other words, he was operating without the 25-pound limitation. And for that period of time, the job got done. And your answer to that is, well, during that time period, it wasn't required to do that. The job didn't demand that he do that. The job didn't require any new ATM, ATM machine installations, which is the large two-man job that he refers to at that time. He testified that he installed one ATM machine by himself, and he did a removal, and he did some moves of these ATM machine and airbag machines during that short period of time. The testimony from Mr. Kolodyski, who had been there for many, many, many, many years, is this is what—if someone who had been working there long-term would encounter. So, I guess what the EEOC is trying to say is those are marginal tasks. I guess that's what the court is kind of getting to, is that if he only had to do it once or twice, therefore, it is a marginal task. We would disagree with that because he doesn't know that an ATM machine might be out when he gets to a job location and have to work on getting that replaced or repaired or removed. That goes to the point of these employees work autonomously, and so they don't know what they encounter. The dispatch just gets a call that says, you know, the machine's not working. When he gets there, he is to decide what is to go on. It would be unreasonable to have Cash Depot have someone on call that has to go away from their job, the other technician in the 150-mile radius, to help Mr. Galloway. And I don't think—the case law doesn't require that Cash Depot modify his essential functions. His essential functions, maybe removing the machine or installing a 900 machine are every now and then, but repairing them is not. We turn to the reasonable accommodations that the EOC has brought up. The first one we've just talked about, the feasibility of the coin divisions. There actually isn't any evidence in the record other than Mr. Galloway saying he could have done that. There's no evidence from Cash Depot in the serialization of the coin bags that he ever put coins in multiple bags for convenience purposes, as was discussed here today. If a coin—if the coin bags only hold $50 worth of coins, and there is more than $50 worth of coins in a cash machine, it would require two bags to get all of the coins out. But that—as a procedure and a practice, these serialized bags are for safety reasons and for tracking reasons of how much money is being dispensed and then recorded. Well, according to what I have read, that during Murphy's deposition, he was asked about other workers who had received accommodations. Can you tell me what circumstances were—what type of accommodations we're talking about? I don't have any actual evidence of the accommodations to which Mr. Murphy was discussing in there. When I asked my client about it, they didn't have anything. I think someone may have had a back surgery and they went on FMLA, but Mr. Murphy was really removed from the day-to-day operations of this company. I don't put much credence in his testimony, and it's clear that the EEOC likes him, as opposed to Mr. Mueller and Mr. Kolodziski, because they're actually on the day-to-day operations of the business. But I'm not aware of Cash Depot ever accommodating someone with a 25-pound lifting restriction at all. The next accommodation that the EEOC brings up is just assigning the work to other employees. And as I've talked about earlier, number one, the ADA doesn't require an employer to reassign. And that goes to the extent of whether it's marginal or an essential function. And I've talked about the essential functions. I do want to talk briefly, before I run out of time, about the reassignment to Judge Hughes. Judge Hughes allowed sufficient discovery in this case. The EEOC takes issue with not being allowed to depose Ms. Lassiter. Ms. Lassiter was no longer an employee at Cash Depot. Ms. Lassiter's contact information, phone number, address, and telephone was provided at the first status conference in January by me. They were told they could contact her. They never did during the entire procedure. There was nothing prohibiting them from contacting Ms. Lassiter or getting any type of statement from her, which the rules allow for under 56D. Under 56, they could have gotten a statement from her if they thought there was something untoward about the termination or that she had any specific information. Well, was there an order not to depose her? No. Judge had an order against him taking depositions without his approval or something like that. There was a request at the last status conference to take her deposition, and the judge denied it at that point. But from the time of inception through, I think that was in May, perhaps, there was no order that prohibited them from even speaking to her. They never took the initiative to do any of that discovery. They got 2,000 pages of documents, emails, every email, his entire file, his payroll file. They got interrogatory answers from the CEO. They took three depositions. There was no prohibition on any meaningful discovery that they didn't have access to do prior, and I see I'm out of time now. I guess I just don't understand. So the justification for denying them an opportunity to depose her is that you didn't do it sooner? No, no, I'm just saying that they didn't ask at any time during the entire process of discovery. We had a status conference every month. But what's the justification for the judge's decision that no discovery should be allowed, no deposition should be allowed? How does the judge justify that? What Judge Hughes actually said was that they had an opportunity to talk to her. They didn't, and they haven't shown how what she has to offer is any different than what's already in the documents and the discovery that they have. Thank you. We'd ask that you affirm the summary judgment. Thank you. A few quick points on rebuttal, Your Honors. First and foremost, we absolutely don't dispute that repairs were an essential part of Mr. Galloway's job. We're not saying that the repair work that he did was marginal, but that as a practical matter, he could do the repairs. Um, as we point out in our brief, excuse me, this is at Record Excerpt 17, Mr. Galloway's testimony is that air machines were made up of separate parts, which were assembled on site and disassembled on site to be removed. I was not ever required to lift more than 25 pounds in handling air machine parts or in repairing air machines. And with respect to the ATMs, Mr. Galloway's testimony, again on Record Excerpt 17, my duties in this regard entailed primarily eliminating bill jams, fixing malfunctioning keyboards, and providing computer updates. The performance of these duties did not entail any lifting function in excess of 25 pounds. My friend on the other side has referred to moving ATMs. The only evidence that Mr. Galloway ever had to do that is again on Record Excerpt 17, and it says, over the course of my seven months' employment with Cash Depot, I installed only one air machine, replaced one air machine base, and unbolted and slid an ATM machine just a few feet on one occasion. So we— You agree he wouldn't be able to do that by himself? I'm sorry? You agree he wouldn't be able to do that by himself? We would agree. It's unlikely that he would have been able to do that with his lifting restriction. And that takes me to my other point, is my friend on the other side relies heavily on Mr. Holliday's declaration, sort of describing a number of, you know, one-off job tasks that may require lifting more than 25 pounds on occasion. We're not saying that repair work is a marginal function, but we're saying those sorts of curveball, one-off events, a reasonable jury could conclude that those were not essential functions. And there are multiple reasons a jury could reasonably reach that conclusion. Firstly, the job description where Cash Depot had every incentive to set out the requirements it demanded of its field service technicians appeared to state that the job could be accomplished, the essential functions, as long as you were able to lift up to 20 pounds. There is no evidence of Mr. Galloway or any other field service technician ever performing these tasks. My friend on the other side refers repeatedly to Mr. Holliday's experience in the field, but critically, nothing in his declaration actually states, during my time as a field service technician, I did this work. Here's how often I did it. It's silent on that. Thirdly, during their depositions, Cash Depot's well-prepared witnesses, not a single one of them mentioned these supposedly essential job tasks that materialized later in Mr. Holliday's declaration. And finally, even Mr. Holliday's declaration, by its own terms, suggests that responding to each and every potentiality that could possibly arise on a worksite isn't an essential function. The declaration describes the air compressor's top compartment as weighing 140 pounds. But even in litigation, Cash Depot has never suggested a lifting requirement that extreme. Indeed, in Mr. Murphy's deposition, he said that a 100-pound lifting requirement would be excessive. That's at ROA 131. And Mr. Holliday himself initially testified that he thought somebody with a lifting restriction of 50 pounds could do the job. And that's at ROA 404. None of that's consistent with the idea that an essential function of the job is being able to lift a 140-pound air compressor top compartment. Finally, just a quick point on the discovery issues. Opposing counsel has mentioned that the EEOC did not seek Lassenery's deposition earlier in the process. And I just wanted to point out that the reason for that is we were pursuing the deposition of CEO Charles, and it was only after the district court denied that deposition that we requested, okay, if you're not going to allow us to take that deposition, please allow us to take at least this other one. So, we ask that this court reverse the grant of summary judgment, reverse the arbitrary restrictions placed on discovery, and reassign this case on remand to a different district judge. And if I may, I didn't want to use your rebuttal time with this, because I'm just curious. Mr. Galloway could have pursued this claim on his own behalf? He could have. He could have filed it individually on his own behalf? I guess my ultimate question is, how does the EEOC decide that it's going to pursue the claim on its behalf, if that was happening? So, yes. So, what happens is somebody who's alleging employment discrimination has to exhaust their administrative remedies by filing a discrimination charge with the EEOC. The EEOC conducts an investigation, and if we conclude that there's reasonable cause to believe that the employer has violated one of the anti-discrimination statutes, we then may take up the case on the employee's behalf. If the EEOC chooses to do that, the claim sort of becomes ours, but the charging party— And I guess what I'm getting is, I knew everything you're telling me up to this point. My question, and I'm probably not doing a good job of asking it is, how does the EEOC decide that it's going to pursue the claim, rather than just handing the claimant a right to sue later? So, I suppose that's a sort of a discretionary— All right. If it's something I shouldn't know, maybe I shouldn't know it, but I'm curious. Well, the field offices, you know, following the investigation, they sort of determine, based on their local prerogatives, you know, which cases to carry forward and which to leave the charging party to pursue on their own. But just to clarify, if Mr. Galloway had wanted to intervene in the district court, you know, in case his interests diverged in any way from the EEOC's, he would have been able to do that. Thank you. Thank you very much, Johannes.